CORNELIUS (HENRY v.). See Case No. 6,380.

## Case No. 3,235.

### The CORNELIUS C. VANDERBILT.

[Abb. Adm. 361.][1]

District Court, S. D. New York. Dec. Term, 1848.

COLLISION—STEAM AND SAIL—DEPARTURE FROM RULE—NEW YORK HARBOR.

1. Where a steamer and sailing vessel are approaching each other in dangerous proximity, it is not, in ordinary circumstances, the duty of the sailing vessel to give way to the steamer; but it is her right and her duty to maintain her course.

[Cited in The Sunnyside, Case No. 13,620.]

2. But if there are special circumstances from which it clearly appears that the sailing vessel can prevent a collision otherwise inevitable, by a departure from her course, she is bound to make it.

[Cited in The Nacoochee, 22 Fed. 859.]

3. A sailing vessel on the wind, meeting or converging towards a common point with a steamer, has no right to persist in her course in such a manner as to make a collision probable, or so as to drive the steamboat into danger or exposure in order to avoid her, particularly after being hailed to change her course.

[Cited in McWilliams v. The Vim, 12 Fed. 914; The Garden City, 19 Fed. 535.]

4. This principle is especially applicable to sailing vessels and steamers meeting in the harbor of New York.

This was a libel in rem, by Elias S. Bloomfield, owner of the sloop Grocers, against the steamboat Cornelius C. Vanderbilt, to recover damages for a collision between the two vessels.

Bloomfield, for libellant.

H. B. Cowles, for claimants.

BETTS, District Judge. On the afternoon of the 25th of July last, the steamboat Cornelius C. Vanderbilt, and the sloop Grocers, owned by the libellant, came into collision off the Battery, in the harbor of New York. The sloop sustained damages, as is alleged, to the amount of about $400.

The collision occurred in the following manner:—The steamboat left pier No. 1, on the North river side, at her stated time, 5 p. m., for Stonington. Her wheel, as usual, was put hard-a-starboard on starting, in order to bring her round on a curve to her true course, in the shortest space practicable. The wind was southwest, blowing free, and the tide flood. As the steamer was in the act of leaving the dock, and under way, the

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

sloop Grocers was seen out in the river, about a quarter of a mile distant. The sloop was on the wind, upon her starboard tack, heading southeasterly, with the wind free about two or three points. The sloop was bound into the East river and up the Sound. In the direction the two vessels were pursuing, their tracks would necessarily cross, and in such manner as to render a collision inevitable. They struck within a minute or two, the steamer being still on her turn, so that the bows of the two vessels came together obliquely side by side; as some of the witnesses expressed it, they "sagged up against each other." The engine of the steamer had been stopped and reversed, and the wheels were working backward when the vessels struck. When they were several rods apart, the sloop was hailed earnestly from the steamer to luff, or to put her helm down. The master of the sloop replied, "he would be d——d if he would do it." The master of the steamboat Knickerbocker, whose boat was close alongside of the Vanderbilt, and crowded in shore by the latter boat in making her turn or sweep, testifies to the hail and reply, and says that there was sufficient room between the sloop and steamer for the sloop to have luffed and avoided the steamer, and that there was nothing in the way to prevent her so doing, or turning about if necessary. This statement, as to the ability of the sloop to make either movement, is fully supported by the testimony of two passengers on board of the Vanderbilt,—one of them an experienced boatman. The position of the sloop and other vessels in the vicinity prevented the steamer bearing up to the starboard.

Laying out of view the evidence of the master and two pilots of the steamer, and that of the master and two hands of the sloop, whose statements as to the relative positions and acts of the two vessels are in direct conflict, there is opposed to the testimony of the two passengers the evidence of Midshipman Mulligan, who observed the transaction from the frigate Cumberland, at anchor a few rods off from the point of collision. His examination was taken by deposition, out of court, and in applying his statements to the case, it must be remarked, that upon the whole evidence, it is clear he misapprehended the facts in several particulars, or has stated them imperfectly. He says that the steamer Empire State, at the same time, passed the sloop on her starboard side, and also simultaneously passed on that side of a French bark then there;. that the collision took place astern of the Cumberland; that the sloop lowered her peak before the collision, and could not have luffed and gone clear of the steamer. These are circumstances of no great moment of themselves, but the proofs, which show beyond question that the witness was mistaken in every one of those particulars, indicate that the young gentleman was not so clear

and accurate an observer of the occurrence as to justify giving his version higher credit than that of Captain Van Pelt, of the Knickerbocker, who differs from him in each particular, and was so placed with his boat in relation to the transaction as to have a better opportunity to observe the exigency of the situation of the two vessels, and their relative means to avoid it. Messrs. Pomeroy and Richmond, the passengers on board of the Cornelius Vanderbilt, were also placed nearer the scene of action, and were more concerned in noticing and marking what transpired than Mr. Mulligan; and all these testify to his misconception of those facts. Upon the evidence of these three witnesses, then, it is satisfactorily proved to have been within the power of the schooner to have avoided the collision, without hazard to herself, or other inconvenience than that of luffing into the wind, and the few moments' delay which might arise from that manoeuvre. But it is contended by the libellant that he was not bound to take that step, or do any thing other than hold the course upon the wind which the sloop was under at the time.

The court has too often stated and enforced the rule, to be now called upon to reason out its obligation and utility, that in ordinary circumstances the sailing vessel so placed is not required to give way to a steamer; and also, that it is her duty and right to maintain her course, unless something special in the existing facts makes it plain that the steamer cannot avoid a collision, and that the vessel under canvas can prevent it, without endangering her own safety by changing her course. The Narragansett [Case No. 10,019]; The Neptune [Id. 10,120]. See, also, on the relative rights and duties of steamers and sailing vessels in respect to collisions, The New Champion [Case No. 10,146]; The Bay State [Id. 1,148]; The Washington Irving [Id. 17,243]. Then a law higher than any general maritime usage comes in force, and requires every man so to conduct his vessel as to save her and others from the peril of a collision, if he can probably effect it. And more especially will all privilege to a particular tack or course or method of passing, not essential to her own safety, be withdrawn from a vessel, when she has notice that adhering to it will place another in jeopardy. She must then contribute to the common safety in such manner as a sound judgment on the facts and circumstances shall decide to have been necessary and proper. Accordingly, a sailing vessel on the wind, meeting or converging towards a common point with a steamer, has no right to persist in that course as a privileged one, in such manner as to make a collision probable, or to drive the steamboat into certain danger to herself or other vessels in order to avoid her. The Hope, 1 W. Rob. Adm. 157. In the harbor of New York, crowded as it is with craft of all de-

scriptions, so that but a limited space is allowed for the management of large vessels, and where battling eddies and tides are to be encountered, it is more necessary than on broader pathways, for vessels of every class to forego special privileges, and render in their own movements relief to the navigation of others with which there is danger of being brought in conflict, particularly if apprised what is necessary to be done to that end.

The case in question affords an illustration of the necessity and application of this principle. Three steamers of the largest class left adjacent piers at the head of the Battery, at precisely 5 o'clock each afternoon, to make their passages up the Sound. The time and manner of their departure was notorious to everybody sailing in the harbor. It is also well known that they come out of these berths, heading directly west, and must describe a complete circle amongst the shipping in the harbor in making a distance only the length of the Battery, in order to get their course east into the mouth of the river. Whilst moving over that curve, their means of ready self-control are considerably diminished; that is, they cannot sheer quickly to starboard, and generally can only sheer to larboard or stop and back. They are, undoubtedly, bound to use every reasonable foresight and precaution while coming into and working out of this practically crippled state. They must exercise a watchful attention, place competent and sufficient help at every post on board, and proceed so slowly as to secure the most immediate command of their movements which is practicable. Being prepared with and ready to use these precautions, these steamers cannot be compelled to lie in their dock till the harbor is clear of every object that might fall in their way. They are entitled to claim the co-operation of other vessels, when hazard of collision occurs, to take measures on their part to prevent it; and the vessel which shall refuse to yield such aid when conscious of its necessity, and hold doggedly to a supposed right to throw the whole risk upon the steamer, must, in case of accident and injury so caused to her, expect but slender sympathy in her appeal to the equity of courts of justice for recompense.

I hold in this case, that it was a fault in the sloop not to have luffed up into the wind, when so urgently called to do it from the steamer, and where the necessity for her to do so was so strongly probable. The decided weight of evidence is that she could have complied without detriment or exposure to herself, and thus have opened a safe passage for the steamer. The master of the sloop testifies, that when hailed to put his helm down, he answered, "G——d d——n you,

stop the steamboat;" and it is evident that he was influenced by the persuasion that the steamer had taken all the responsibility of the hazard in which the two vessels were placed, and had no right to claim his aid. I do not deem of great account the minute estimates of yards or rods, or moments of time, given by the various witnesses in respect to the transaction, nor whether the collision occurred more or less fathoms from the frigate Cumberland. The essential facts are substantially agreed to by the witnesses, and the opinions of those on board of the sloop, and of Midshipman Mulligan, that her conduct was unexceptionable, and that of the steamer faulty, are overbalanced, in my judgment, by the clear proofs in the case.

I shall accordingly order that the libel be dismissed, but without costs. I do not accede to the impressions of one of the witnesses that the master of the sloop intended to run her against the light works of the steamer. I am satisfied he acted upon the belief that he was entitled to hold his course, and that the steamer, if she approached him or crossed his path, must do so wholly at her own peril. In that he committed an error, which undoubtedly rendered the collision unavoidable by the steamer, and he cannot therefore recover damages for the injury thus brought upon herself, although he may have acted with no purpose or wish to prejudice the steamer. On the other hand, the steamer could have stopped her way on coming out of the slip and discerning the sloop, before becoming surrounded by other vessels, and thus losing the power to extricate herself, and she thus might have gone ahead without interference with the sloop. She was excusable in proceeding and relying upon the concurrence of the sloop, if it should become necessary, to help in opening a way for both; but the disregard of that confidence, and the indisposition of the master of the sloop to do what was reasonable and proper on his part, does not impose an obligation upon him to fulfil it so as to lay a foundation for a demand by the claimant for costs against him therefor. There was some risk in running the steamer into the bay when a sailing vessel was approaching her necessary course, in such manner that it might not be in her power, by her own exertions, to avoid becoming embarrassed by her, and that degree of imprudence, although not culpable, takes away the equity of a claim to costs. Decree accordingly.